UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 2:23-cr-104 |
| ) | |
| JOHN PATRICK GORDON DANE, ) | |
| ) | |
| Defendant. | |

**DEFENDANT'S POSITION WITH RESPECT TO SENTENCING**

John Patrick Gordon Dane, by counsel, respectfully states that he does not have any objections to the Presentence Report (PSR) and with this pleading states his position with respect to sentencing for the Court's consideration.

**INTRODUCTION**

Mr. Dane is before this Court for sentencing after entering a plea of guilty to two charges of the Indictment filed August 9, 2023. Count One charges him with smuggling goods into the United States in violation of 18 U.S.C. §§ 545 and 2. Count Two charges Mr. Dane with felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). Mr. Dane entered his guilty plea on September 14, 2023, pursuant to a written plea agreement, and sentencing is scheduled for February 26, 2024, at 11:00 a.m.

Count One carries a maximum penalty of twenty years in prison and Count Two has a maximum penalty of fifteen years in prison. The advisory guideline range is 57 to 71 months.

A sentence between 24 to 36 months (2 to 3 years) imprisonment complies with the statutory mandate that a sentence be "sufficient, but not greater than necessary" to

accomplish the goals of sentencing. *See* 18 U.S.C. § 3553(a). Specifically, this requested sentence range is appropriate because: (1) Mr. Dane's criminal conduct, while serious, was of a relatively short duration; (2) his prior record is minimal and his prior felony conviction is old and not particularly serious; (3) this will be his first time in prison and the longest period of incarceration he has ever served, (4) he has strong family support and will return to a stable home environment; (5) he has a history of full-time employment and is a low risk to reoffend; (6) he immediately cooperated with law enforcement by waiving his *Miranda* rights and admitting to his behavior; (7) he has already been sufficiently deterred from future criminal conduct and, (8) a below-guideline sentence is consistent with sentences imposed in similar cases within this District.

## THE APPROPRIATE SENTENCE IN THIS CASE

The overriding principle and basic mandate of 18 U.S.C. § 3553(a) is to impose a sentence "sufficient, but not greater than necessary," to comply with the four purposes of sentencing set forth in § 3553(a)(2). The requirement that the sentence be sufficient, but not greater than necessary, is not just another factor to be considered along with the others. Rather, it sets an independent limit on the sentence. Through § 3553(a), Congress requires federal courts to impose the least amount of imprisonment necessary to accomplish the purposes of sentencing.

In determining the appropriate sentence, the Court must consider (a) the nature and circumstances of the offense and the history and characteristics of the defendant; (b) the kinds of sentences available; (c) the advisory guideline range; (d) the need to avoid

unwarranted sentencing disparities, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and provide the defendant with educational or vocational training and treatment; and, (e) the need for restitution, when applicable. 18 U.S.C. § 3553(a). The law must "tak[e] into account the real conduct and circumstances involved in sentencing," *Gall v. United States*, 552 U.S. 38, 54 (2007), as well as the defendant's personal history and characteristics, 18 U.S.C. § 3553(a)(1). The guidelines cannot account for these case-specific factors. Therefore, the Court must "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall,* 552 U.S. at 52.

A.  **The nature and circumstances of the offense support a sentence between 24 to 36 months' imprisonment.**

This is Mr. Dane's first case in federal court and will be his last. The Statement of Facts, which is set forth verbatim in the PSR, details the offense conduct. PSR ¶ 6 (pages 4-11). In short, an undercover agent with ATF and an undercover detective with the Virginia Beach Police Department purchased two Glock switches from a man at a bar in Virginia Beach, Virginia on December 15, 2022, for $1,000.00. A search warrant was executed at the man's residence on January 4, 2023, and he was questioned by law enforcement. He told agents he had purchased the two switches from Mr. Dane for $600.00. Based on the undercover purchase of the two switches, the man's statements as well as additional information he provided about Mr. Dane, law enforcement obtained a

federal search warrant for Mr. Dane's residence in Virginia Beach, Virginia.

In early January 2023, Homeland Security Investigations (HSI) was investigating Mr. Dane pertaining to a package that Customs and Border Patrol had intercepted addressed to Mr. Dane. The package contained firearm silencers.

The search warrant was executed at Mr. Dane's house on January 10, 2023. Mr. Dane was home at the time and was in the shed located in the backyard. He was taken into custody and was cooperative with law enforcement. No firearms or related parts or ammunition were found inside the house. Rather, firearms, two Glock switches (one affixed to a Glock handgun), firearm parts and ammunition were located in the shed by law enforcement. A total of seventeen firearms, including the two switches, were seized by law enforcement. Of these, nine were fully assembled. After being advised of and waiving his *Miranda* rights, Mr. Dane was questioned by agents and made admissions. Mr. Dane admitted that he had ordered the switches and silencers online and had sold them for a profit. He told the agents that he utilized Facebook Marketplace to arrange for the sale of firearms, parts, switches and silencers. Mr. Dane told the agents that he knew he was a convicted felon and was not supposed to possess firearms. Mr. Dane also admitted to occasionally using methamphetamine.

Mr. Dane was initially charged in state court. He was held in state custody from January 10 to January 13, 2023, and then again from April 21, 2023 to June 22, 2023 when the state charges were nolle prossed (*see* PSR ¶ 46), for this federal prosecution. Mr. Dane has been in federal custody since June 23, 2023.

As he admitted to the agents, Mr. Dane knew it was illegal for him to possess

4

firearms. What started out as a hobby repairing and fixing firearms got away from Mr. Dane and ultimately led to his arrest. Admittedly, Mr. Dane failed to recognize the seriousness of what he was doing at the time but now fully realizes the potential danger of his actions in selling firearms unlawfully. In sum, Mr. Dane has accepted responsibility and assures the Court that he will not possess guns or engage in any illegal activity in the future.

**B.      A sentence within the range of 24 to 36 months is appropriate in light of Mr. Dane's personal history and characteristics.**

Mr. Dane is 36 years old. He was born and raised in Virginia Beach, Virginia. His parents were married and gave Mr. Dane and his younger brothers and sister a healthy, stable and positive childhood. Mr. Dane's family calls him "JP" for John Patrick. Mr. Dane's parents emphasized education and lived in a safe area in Virginia Beach. Growing up, Mr. Dane enjoyed playing with his siblings and other kids in the neighborhood. His father, mother, and stepmother all describe "JP" as a "wonderful child" who has always been a "good friend to his brothers and sister," "kind, thoughtful," well mannered, and "polite." *See* Exhibits 1-3.[1]

Mr. Dane's parents began to experience relationship difficulties when he was around 12 years old, and they eventually separated for good when he was 14 years old.[2]

---

[1] Exh 1 – Letter of Support from Mr. Dane's father, Richard Dane; Exh 2 – Letter of Support from Mr. Dane's mother, Debra Dane; and Exh 3 – Letter of Support from Mr. Dane's step-mother, Jacqueline Walker.

[2] The PSR notes that Mr. Dane's parents separated when he was 12 years old. PSR ¶ 12. However, Mr. Dane's father advises that while problems between him and his (now) ex-wife began then leading to initial periods of separations, their eventual final separation occurred when "JP" was 14 years old.

5

His parents' separation and their divorce proceedings were difficult on young "JP." His younger brothers and sister continued to live with their mom and "JP" went to live with his father. In their respective letters of support, both his father and mother describe the change they saw in Mr. Dane during this "family turmoil." Exh 1; *see also* Exh 2. They describe "JP" as being mistrustful and defiant during that time. *Id.* They also noticed that he began to have different friends and spent time with the "wrong peers." *Id.* The PSR notes that it was during this time that Mr. Dane began to smoke marijuana. PSR ¶¶ 60, 64. As if his parents' divorce were not a sufficient challenge for JP, when he was 16 years old, his dad was "shot by a friend of his mother's." Exh 1. After his dad's release from the hospital, JP helped him recover. *Id.* This incident understandably had a profound effect on Mr. Dane as he was incredibly close to his dad who almost died.

JP attended Tallwood High School in Virginia Beach but stopped attending his senior year "because he was working full time and did not want to wake up early in the morning for school." PSR ¶ 65. To his credit, he obtained his GED from the Adult Learning Center in Virginia Beach in 2005 when he was 18 years old. PSR ¶ 66.

Mr. Dane has worked consistently since he was a teenager. He started working at the Yukon Steak House in Virginia Beach while in high school. PSR ¶ 77. After high school, he switched to doing flooring and roofing work. *Id.* Those were long, hard days but JP has never been afraid of hard work. From 2006 to 2014, he was employed as a bar manager for Parlays Local Tavern in Virginia Beach. Tiring of the bar business, Mr. Dane transitioned back into working with his hands, this time focusing on plumbing, welding and construction. He participated in an apprentice program with Southern Air

Corporation in Roanoke, Virginia from 2018 and 2019. PSR ¶ 68. The PSR notes full time employment with Southern Air, Ragan Sheet Metal, Davken Mechanical, JRC Mechanical and Why Not Construction. *See* PSR ¶¶ 71-75.

Mr. Dane has never been married but has been in a committed relationship with Katherine Lintz. At the time of his arrest, they were living together. Mr. Dane considers Ms. Lintz's daughter as his daughter and misses her very much. To say he's disappointed in himself is an understatement. The disappointment he feels now and the realization that his actions have consequences for the people he loves most will motivate him to remain law-abiding in the future.

Mr. Dane's criminal history is limited to convictions for trespassing in 2006, driving on a suspended license in 2007, failure to appear in 2007, driving while intoxicated in 2008 and possession of marijuana with the intent to distribute in 2012 when he was 23 years old (probation violations in 2013 and 2014). *See* PSR ¶¶ 34-38. With regard to the felony conviction, it should be noted that Mr. Dane was initially charged with *possession of marijuana*. *See* PSR ¶ 44. When Mr. Dane appeared in court for that charge, it was nolle prossed. *Id.* About two weeks later, he was charged with the felony of possession with intent to distribute marijuana. PSR ¶ 38. The PSR notes that the quantity of marijuana possessed by Mr. Dane was 30 grams, allowing for the felony charge[3]. *Id.* Without minimizing the offense of possession with the intent to distribute

---

[3] At the time of this offense in 2011, Virginia Code § 248.1(a)(2) provided that it was a Class 5 felony for any person to sell, give, distribute or possess with intent to sell, give, or distribute more than one half-ounce but not more than five pounds of marijuana. This code section was amended in 2020 increasing the minimum quantity to more than one ounce.

7

marijuana, this felony conviction was not for conduct that was overly serious or in any way violent.

Mr. Dane's time in custody has not been easy or enjoyable. To be sure, his incarceration has been punishment. But, Mr. Dane has taken the time to think about what he did, acknowledge how he hurt his loved ones, and process how – by selling guns – he could have inadvertently helped someone else bring about violence.

Mr. Dane is fortunate to have strong support from his family. The letters of support filed with this pleading document his admirable qualities and past good deeds. The overall tone of the letters is one of support, compassion, and optimism. This support will be essential for Mr. Dane during his time in prison and his success upon release.

Possessing and selling guns illegally is a serious offense. Mr. Dane is not proud of what he did and is prepared to pay the consequences. Two to three years in prison is sufficient punishment considering Mr. Dane's history and characteristics.

**C.     The sentence recommended by the guidelines is greater than necessary and the sentence requested by the defense is sufficient to deter Mr. Dane and to protect the public.**

Mr. Dane respectfully asks the Court to impose a sentence between 24 to 36 months' imprisonment. In this case, a sentence within the advisory guideline arrange is greater than necessary to comply with the directives of 18 U.S.C. § 3553. A sentence between two and three years is enough.

The advisory guideline range is increased significantly by the four-level enhancement Mr. Dane received for the offense involving a firearm having an altered or obliterated serial number pursuant to U.S.S.G. § 2K2.1(b)(4)(B). *See* PSR ¶ 22. In May 2022,

8

Mr. Dane took two AR-15 lower receivers to a Federal Firearms Licensee (FFL) to be worked on. As it turned out, one of the receivers had an obliterated serial number. PSR ¶ 8. Mr. Dane had previously purchased a box of firearm parts from an individual he met via Facebook Marketplace. He then found the FFL since he was looking for someone who could remove or strip the cerakote from the receivers and other firearm parts.[4] Mr. Dane brought the box of firearm parts to the FFL who agreed to re-finish the receivers and other related firearm parts for Mr. Dane. Mr. Dane did not know at the time that the receiver had an obliterated serial number. He learned that from the FFL when he returned to pickup the receivers and parts. The FFL told Mr. Dane that he had called the ATF and that he had given the receiver with the obliterated serial number to the ATF. It is important to note that the FFL told two ATF agents that the receiver in question "was originally painted gold, and that there were multiple layers of paint that had to be removed before he saw clear indications that the serial number was missing." *See* May 17, 2022 ATF Report of Investigation. In other words, it was not initially observable that the serial number was missing. To be sure, for this enhancement to apply, knowledge of the altered or obliterated serial number is not required. *See* U.S.S.G. § 2K2.1, comment. n. 8(B).[5] However, that Mr. Dane was not aware of the missing or obliterated serial number on the receiver is a circumstance the Court can consider in weighing the

---

[4] Cerakote is the brand name for a type of a ceramic coating frequently used on firearms to protect the firearm (from the elements, scratches, etc.) and to add aesthetic value.
[5] "Subsection . . . (b)(4)(B)(i) applies regardless of whether the defendant knew or had reason to believe that the firearm . . . had an altered or obliterated serial number." U.S.S.G. § 2K2.1, comment. n.8(B).

appropriateness of a guideline sentence especially coupled with the fact that none of the firearms seized from his shed had obliterated serial numbers.

The Guidelines also fail to adequately account for certain mitigating aspects of Mr. Dane's criminal history, which supports a sentence below the guideline range. First, Mr. Dane's only felony conviction is 1) old (from 2012), 2) was committed when he was a very young man (age 23), 3) was non-violent and not particularly serious, and 4) did not involve firearms. As noted above, Mr. Dane was originally charged with possession of marijuana, but that charge was nolle prossed and the felony charge was obtained. PSR ¶ 44. Facts of the offense that supported "possession with intent to distribute" were the weight of the marijuana found in Mr. Dane's car and his statements to the arresting police officer. The weight, 30 grams, was enough for the felony in 2011 under Virginia Code § 248.1(a)(2) which made it a Class 5 felony to possess with intent to distribute more than one half-ounce but not more than five pounds of marijuana.[6] In addition, Mr. Dane admitted to the officer that he essentially distributed to his friends ('[Mr. Dane] stated his friends paid him $5.00 to $10.00 to pack a bowl of his high-quality marijuana."). PSR ¶ 38. One may wonder with the legalization of the use of marijuana in Virginia (and elsewhere) whether someone with these facts and circumstances would even be charged with the felony today. To that point, § 248.1(a)(2) now requires the minimum quantity to be more than one ounce for the felony offense - just two grams less than Mr. Dane

---

[6] Virginia Code § 248.1(a)(2) was amended in 2020 and now provides that it is a Class 5 felony to possess with intent to distribute more than one ounce but not more than five pounds of marijuana. And possession with intent to distribute less than one ounce of marijuana charge in Virginia is a Class 1 misdemeanor. Virginia Code § 18.2-248.1(a)(1).

"possessed with intent to distribute" in 2011. In any event, while a felony, Mr. Dane was far from a serious or regular seller of marijuana. In addition, the offense was in no way violent and did not involve a firearm. Other than the subsequent probation violations in March 2013 and September 2014[7] relating to this conviction, the only other conviction Mr. Dane has is for driving on a suspended license in January 2013. *See* PSR ¶ 39.

As noted in the PSR, Mr. Dane has zero criminal history points. Last year, in adopting Amendment 821, the Sentencing Commission noted that "Recidivism data analyzed by the Commission suggest that offenders with zero criminal history points ('zero-point' offenders) have considerably lower recidivism rates than other offenders, including lower recidivism rates than the offenders in Criminal History Category I with one criminal history point."[8] Section 4C1.1 created a two-level decrease in the offense level for offenders with zero criminal history points. Although Mr. Dane does not qualify under the wording of the guideline (as he possessed and sold firearms), the research behind the amendment still applies; with zero criminal history points, Mr. Dane has a low likelihood of recidivism. The Court can consider this in determining the appropriate sentence.

Notably, Mr. Dane has never served time in a prison. For his felony marijuana conviction, he received four years' incarceration which was suspended. PSR ¶ 38. For the

---

[7] Mr. Dane's probation was revoked due to his failure to pay the program fee for the Virginia Beach Comprehensive Substance Abuse Program, testing positive for marijuana and the conviction for driving on a suspended license. *See* PSR ¶ 38 (pgs 15-17).

[8] United States Sentencing Commission, Amendments to the Sentencing Guidelines (Preliminary), dated April 5, 2023, Proposed Amendment: Criminal History, pgs 2-3.

related probation violation in March 2013, he received a suspended sentence. *Id.* And for the probation violation in September 2014, he received 30 days' incarceration which he served in the Virginia Beach Jail. *Id.*

As the First Circuit observed, one "easily discernible goal of the sentencing guidelines" was "to punish more severely those offenders who previously have received lengthy sentences." *United States v. Carrasco-Mateo*, 389 F.3d 239, 244 (1st Cir. 2004). This rationale is premised primarily on specific deterrence. As the Second Circuit explained, "a major reason for imposing an especially long sentence upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishments failed to achieve. That reason requires an appropriate relationship between the sentence for the current offense and the sentences, particularly the times served, for the prior offenses." *United States v. Mishoe*, 241 F.3d 214, 220 (2d Cir. 2001). That is to say, if an individual previously spent four years in prison for illegally selling guns or possessing firearms and then committed the same offense or a similar again in the future, that sentencing court may determine that a longer sentence is "necessary" to achieve specific deterrence the second time around. Here the requested sentence is 24 to 36 times longer than Mr. Dane's prior sentence of incarceration, and he'll be required to serve it in the BOP.

It's not uncommon for this Court to sentence defendants who have served multiple multi-year stints in state prison before facing prosecution in federal court. This Court frequently sentences people who have five, ten, or even fifteen convictions on their record. Mr. Dane doesn't have a record like that. Given his history, any period of incarceration in a prison facility will have a significant impact. When measured against

12

Mr. Dane's prior record and minimal prior incarceration, Mr. Dane's requested sentence of two to three years is appropriate.

In some situations—perhaps in cases involving violence or where there are victims—it may be necessary to impose a lengthy of period of incarceration notwithstanding an individual's lack of significant criminal history or minimal history of incarceration. But lengthy incarceration is not needed here. The Court can be assured that a two to three-year period of incarceration will both punish and deter Mr. Dane without being greater than necessary.

Mr. Dane's remorse for his actions and cooperation[9] with law enforcement are consistent with someone who will not take his freedom for granted in the future. His criminal behavior in this case was of a limited duration. And there is little risk of him repeating this conduct in the future given this prosecution and the length of his impending imprisonment. Mr. Dane knows what he needs to do to ensure he never appears before this Court again: he must stay away from firearms for the rest of his life.

**D.     The defense requested sentence range will reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and avoid unwarranted disparities.**

A sentence of imprisonment between 24 and 36 months of imprisonment is sufficient to reflect the seriousness of the offense, promote respect for the law, to provide just punishment, and to afford adequate deterrence to both Mr. Dane and the public.

---

[9] By "cooperation," counsel means Mr. Dane's cooperation with law enforcement during the execution of the search warrant at his residence, his waiver of his *Miranda* rights, and his agreeing to be interviewed by law enforcement about his actions following his arrest.

Imposing a prison sentence from two to three years on someone who has never been to prison, like Mr. Dane, reflects the seriousness of his conduct and the offense while also promoting respect for the law. Mr. Dane has been detained pretrial and pending sentencing in this matter significantly longer than his prior period of incarceration. His incarceration has been difficult and, as expected, punitive. Like other detainees held at the Western Tidewater Regional Jail (WTRJ), he has been separated from his loved ones and family and his freedom has obviously been severely restricted. However, unlike many of the inmates at that jail, Mr. Dane has been attacked and assaulted multiple times. *See* Exh 4 – Mr. Dane's letter to the Court. He has also had his property stolen on multiple occasions and been the victim of extortion attempts. *Id.* His health has suffered from the stress of his incarceration and general lack of sleep. In short, Mr. Dane's past eight months at WTRJ has been *punishment* and arguably amounts to more than "just punishment" for his experience there. The additional time Mr. Dane spends in prison will of course be further punishment.

In addition, after his release from prison, Mr. Dane will be on a period of supervised release which is also punishment. Supervision in general is a substantial restriction of his liberty. *Gall v. United States*, 552 U.S. 38 (2007) (explaining that standard conditions of supervision "substantially restrict [defendants'] liberty"). The defense's requested sentence provides for sufficient and "just" punishment for Mr. Dane.

Mr. Dane is now a federal felon, which takes on its own import. Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal

14

deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id.*; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").[10]

Even the National Institute of Justice, which is part of the Department of Justice, recognized that courts must consider the difference between deterrence versus incapacitation in arriving at the appropriate sentence. Lengthy sentences may exacerbate recidivism, failing to recognize that individuals tend to outgrow criminal activity as they age. U.S. Dept. of Justice, *National Institute of Justice Five Things About Deterrence* (May 2016), *available at* https://www.ncjrs.gov/pdffiles1/nij/247350.pdf (last accessed Jan. 7, 2019) (acknowledging that "[i]ncreasing the severity of punishment does little to deter crime"). Mr. Dane's response to this prosecution is consistent with individual deterrence, and he is extremely unlikely to break the law in the future. A sentence above 36 months is not necessary to deter Mr. Dane from committing future crimes.

A below guideline sentence is also consistent with sentences imposed by courts in this District in similar cases. In similar § 922(g)(1) cases, courts have imposed sentences

---

[10] *See also* Valerie Wright, *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, The Sentencing Project, at 1 (Nov. 2010), *available at* http://www.sentencingproject.org/doc/Deterrence%20Briefing%20.pdf (last accessed Mar. 17, 2022); *see also* Anthony N. Doob & Cheryl Marie Webster, *Sentence Severity and Crime: Accepting the Null Hypothesis*, 30 Crime & Just. 143, 187 (2003); Mirko Bagaric, *A Rational Theory of Mitigation and Aggravation in Sentencing: Why Less Is More When It Comes to Punishing Criminals*, 62 Buff. L. Rev. 1159, 1202-03 (2014).

far lower than 36 months of imprisonment. In *United States v. Hatchett*, No. 2:18-cr-44 (E.D. Va. Nov. 5, 2018), this Court imposed a 90-day sentence for a felon in possession offense when defendant bought two guns through a straw-purchaser and resold them in New Jersey. In *United States v. Toole*, No. 3:19-cr-13, ECF No. 69 (E.D. Va. July 31, 2019), the Court imposed a 13-month sentence where the defendant, who was himself a felon, received a leadership role enhancement for directing his non-felon co-conspirator to straw-purchase guns for him, some of which he later resold. In *United States v. Giles*, No. 1:19-cr-139, ECF No. 57 (E.D. Va. Sept. 20, 2019), the Court imposed a 33-month sentence when the guidelines recommended 70-87 months. In that case, the defendant was convicted of possessing a firearm as a felon and—according to the government— "engaged in a conspiracy" over three years "to illegally purchase over 45 firearms in Virginia, and then illegally sell those firearms to numerous individuals residing in Maryland and Washington, D.C." *See* No. 1:19-cr-139, ECF No. 46 (gov't position paper).

The sentencing outcome in *United States v. Sydykov*, No. 1:118-cr-212, ECF No. 76 (E.D. Va. Jan. 11, 2019), is also noteworthy even though it is not a § 922(g)(1) case. There, the Court sentenced the defendant to 36 months, when guidelines recommended 45 to 57, for working with a partner over the course of two years to illegally send to Chechnya 7 full pistols, 130 assembled lower receivers, 266 firearm slides, 158 firearm barrels, 996 firearm magazines, 10 stocks, 133 firearm frames, and 453 firearm parts. No. 1:118-cr-212, ECF No. 71 (gov't position paper). Mr. Sydykov's partner was sentenced to 46 months of imprisonment. *Id.* In *United States v. Rodriquez,* though again not a § 922(g)(1) case, the Court imposed a sentence of 18 months when the guidelines recommended 46 to 57

16


months of imprisonment. No. 1:19-cr-153, ECF No. 48 (E.D. Va. Oct. 18, 2019). Mr. Rodriquez was caught sending a 9MM handgun to Honduras and confessed that he had been smuggling weapons out of the United States *for twenty years* and sold them during his trips to Honduras. No. 1:19-cr-153, ECF No. 43 (gov't sentencing position paper).

Finally, in *United States v. Pino*, No. 2:17-cr-70, the defendant was convicted of interstate transfer of a firearm and was sentenced to 30 months' imprisonment. No. 2:17-cr-70, ECF No. 54. In that case, from November 2015 to about January 2017, Mr. Pino purchased at least 60 firearms, posted 146 times on firearms-marketplace website www.VAguntrader.com, advertised at least 50 firearms on firearms-marketplace website www.armslist.com, and resold at least 23 firearms at a profit. ECF No. 45 (statement of facts). Mr. Pino sold some firearms to prohibited people, including a juvenile, a drug-addicted armed robber, and a drug dealer trafficking in stolen firearms. ECF No. 52 at 3 (gov't updated position on sentencing). And some of the firearms sold by Mr. Pino were later linked by law enforcement to more serious crimes such as a "string of armed robberies" and a "maiming investigation." *Id.* at 4, 5. While Mr. Pino was not a convicted felon, his unlawful conduct was more egregious and lasted longer than Mr. Dane's.

Thus, a sentence of 36 months or less in Mr. Dane's case would not only be a "just" sentence on its own terms but is also consistent with sentences imposed in other cases in this District involving similar conduct.

## CONCLUSION

As noted above and in his letter to the Court, Mr. Dane is fully aware of the consequences of his unlawful conduct. He is 36 years old and recognizes that he needs to

live a completely law-abiding life (without firearms) in the future. He has proven himself capable of holding a job and staying out of trouble in the past. He looks forward to returning to the legitimate, honorable work he did prior to his incarceration.

For the reasons set forth above, Mr. Dane requests that this Court impose a sentence between 24 and 36 months of imprisonment. The defense submits that such a sentence is "sufficient, but not greater than necessary" to comply with 18 U.S.C. §3553(a) and to promote the purposes of sentencing.

Respectfully submitted,

JOHN PATRICK GORDON DANE

By: ___/s/_____
Keith Loren Kimball
Virginia State Bar No. 31046
Supervisory Assistant Federal Public Defender
Attorney for John Patrick Gordon Dane
Office of the Federal Public Defender
500 E. Main Street, Suite 500
Norfolk, Virginia 23510
Telephone: 757-457-0870
Telefax: 757-457-0880
Email: keith_kimball@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of February, 2024, I filed this pleading with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

I further certify that I have sent a copy of this pleading, via electronic mail, to:

Latriston L. Cox
United States Probation Officer
Email:  Latriston_Cox@vaep.uscourts.gov

                                                _____/s/_____
                                        Keith Loren Kimball
                                        Virginia State Bar No. 31046
                                        Supervisory Assistant Federal Public Defender
                                        Attorney for John Patrick Gordon Dane
                                        Office of the Federal Public Defender
                                        500 E. Main Street, Suite 500
                                        Norfolk, Virginia 23510
                                        Telephone:  (757) 457-0870
                                        Telefax:  (757) 457-0880
                                        Email: keith_kimball@fd.org